MEMORANDUM OF DECISION 
This memorandum of decision affects five minor children, Juan A., Carlos O., Natalie A., Grace O. and Destiny R., whose parents are the subject of petitions for termination of their parental rights (TPR). On March 29, 2000, the Department of Children and Families (DCF) filed TPR petitions against Ana A. and Juan O., the biological parents of Juan A., Carlos O., Natalie A., and Grace O. On that date, DCF also filed TPR petitions against Ana A. and Roberto R., the biological parents of Destiny R. For the reasons stated below, the court finds these matters in favor of the petitioner.
The original TPR petition against Ana A. alleged that she had failed to achieve statutory rehabilitation. The TPR petition against Juan O. alleges the grounds of abandonment and lack of an ongoing parent-children relationship. The TPR petition against Roberto R. alleges failure to achieve statutory rehabilitation and lack of an ongoing parent-child relationship with Destiny.
The file reflects that DCF obtained custody of Juan, Carlos, Grace and Destiny, through an Order of Temporary Custody (OTC) granted ex parte on October 20, 1998 (Holden, J.) and confirmed at hearing on October 30, 1998 (Holden, J.), upon allegations that the children were neglected while in the sole care of Ana A. On October 30, 1998, the court also ordered specific steps for reunification as to both Ana A. and Roberto R. On December 7, 1998, the court (Holden, J.) issued an OTC concerning the fifth child, Natalie, who had been cared for by out-of-state relatives: Natalie was then placed in a foster home separate from that of her siblings. (Exhibit 5.) On April 29, 1999, after hearing, the court (Lopez, J.) found Juan, Carlos, Natalie and Grace to be neglected children, and committed them to the custody of DCF. On June 30, 1999, the court (Doherty, J.) found Destiny to be a neglected child, and committed her, as well, to the custody of DCF. The children have remained in DCF custody since that date, pursuant to court-ordered extensions of commitment. Thereafter, on March 22, 2000, the court (Lopez, J.) found that reunification efforts were no longer appropriate for Ana A., Juan O., or Roberto R.
Trial of this highly-contested matter was held on May 9, 10, and June 20, 2001. The petitioner and the children[2] were vigorously represented by counsel throughout the proceedings, as were Ana A., mother of all the children in this matter, and Destiny's father, Roberto R.[3]
CT Page 11752 Juan O. was provided with notice of the TPR proceedings through publication on April 8, 2000, at the order of the court.[4] On April 26, 2000, the court confirmed the sufficiency of notice to Juan O., noted his non-appearance, and found him in default.[5] (Lopez, J.) On May 10, 2001, after the commencement of trial, Ana A. tendered her written consent to termination of her parental rights: the court (Quinn, J.)
accepted the consent on that date, after canvass. Thereafter the TPR petition against Ana A. was amended to reflect the single ground of consent.[6]
The Child Protection Session of the Superior Court, Juvenile Matters division, has jurisdiction over the pending matter. No action is pending in any other court affecting custody of these children.
 I. FACTUAL FINDINGS
The Court has thoroughly considered the verified petitions, the TPR social study and addendum, and the multiple other documents submitted in evidence, including the psychological evaluation, reports of service providers, and records of conviction. The court has utilized the applicable legal standards[7] in considering the testimony of trial witnesses, who included DCF personnel, service providers and Roberto R. Upon review, the court finds that the following facts were proven by clear and convincing evidence at trial:
I. A. ANA A., THE MOTHER
Ana A. was born on September 8, 1973. (Exhibit 1.) She completed the ninth grade, and has worked in fast food restaurants and as a building superintendent. Ana A. has a history of chronic, recurrent substance abuse. Prior to her involvement with DCF, Ana A. had received treatment for her cocaine addiction at Connecticut Counseling, Connecticut Renaissance, and the Joseph Center. While she has had periods of abstinence, she remains at noted risk for relapse into her addictive lifestyle. (Testimony of Susan G., Michelle D.)
Ana A. was thirteen years old when she commenced her relationship with Juan O. She gave birth to their first child, Juan, on June 1989. Next she gave birth to their children Carlos on December 1990; Natalie on January 1992, and Grace on November 1993. Ana A. has had no contact with Juan O. since 1996. (Exhibits 2, 5.) She became involved with Roberto R. in late 1993, and gave birth to Destiny on January 1995. (Exhibit 5.) DCF became involved with Ana A. and her five children on October 5, 1998, upon a referral which indicated that the respondent mother was using drugs, and not providing appropriate food for her children. (Exhibit 6.) As noted above, the children entered DCF custody through OTC's ordered by the CT Page 11753 court in the fall of 1998.
During the pre-trial course of these proceedings, Ana A. received a number of referrals to service providers which were prepared to address her substance abuse issues. In 1998, a Morris Foundation (MF) Project Safe social profile identified this respondent's persistent and recurrent social-interpersonal problems, including her predilection for cocaine use, her propensity for developing inappropriate relationships with other drug users, and her inability to fulfill major role obligations such as maintaining employment and providing safe housing for her children. (Testimony of Michelle D., Susan G.) Ana M. was referred to MF's Early Abstinence Program, but she did not participate (Testimony of Michelle D.)
In the spring of 1999, after her children were adjudicated neglected, DCF referred Ana A. to the Family Intervention Center in Waterbury for another substance abuse evaluation: however, she did not attend scheduled treatment sessions, asserting that she was not in need of assistance. (Testimony of Joseph F.) In February 2001, at her lawyer's referral, Ana A. enrolled in St. Mary's Hospital Behavioral Health Institute for treatment of Cocaine Dependence. While Ana A. cooperated fairly well with the initial phases of this program, sadly, she still did not improve her ability to make judgments about her personal relationships, did not develop insight into her predicament, and did not attend the substance abuse treatment sessions which were recommended. (Exhibits B, 42; Testimony of Susan G.)
In the fall of 2000, Ana A. underwent an individual and interactional evaluation by Bruce Freedman, Ph.D., a skilled and experienced forensic psychologist. Ana A. interacted well with her children during this visit, and the family bond was apparent. However, Dr. Freedman discerned several factors that impeded Ana A.'s ability to serve as an appropriate primary caretaker. These factors included her substance abuse issues, which remained unresolved despite treatment; and her personality, behavior patterns and reduced intellectual capacity, which led her to exercise poor judgment in selecting male partners, and to become unreasonably dependent upon others. (Testimony of Dr. Freedman. See also Exhibits 8, 15.)
I. B. JUAN O., THE FATHER OF JUAN, CARLOS, GRACE AND NATALIE
Juan O. was born in Worcester, Massachusetts. After his last contact with Ana A. in 1996, his whereabouts have remained unknown for some time. Juan O. was last thought to reside in Providence Rhode Island, where he was employed at a fast food restaurant. (Exhibits 2, 5.) However, as discussed above, this respondent has consistently failed to respond to court-ordered notices of the proceedings involving his CT Page 11754 children. He has not had any contact with his children since 1996. (Exhibits 2, 3, 5.) Since their 1998 placement in foster care, he has never visited Juan, Carlos, Natalie or Grace. He has never offered himself as a resource for the children, never inquired about their status, and has never sent them any communications or gifts. (Exhibit 5.)
I. C. ROBERTO R., THE FATHER OF DESTINY
Roberto R. was born on November 27, 1971. He completed the tenth grade, and has worked in manufacturing. (Exhibit 5.) By his own admission, Roberto R. has a history of involvement in drug-related activity, related criminal convictions, and convictions for failure to appear in court when ordered to do so. He has been incarcerated continuously since late 1995. (Exhibit 5; Testimony of Roberto R.)
Roberto R. lived with Ana A. for several years prior to Destiny's birth on January 1995. He remained at that household for approximately one month after this child was born,[8] and then moved from the premises to live on his own. He continued to visit Ana A.'s home on a regular basis until his incarceration in Connecticut for a drug-related offense,[9]
which occurred some time prior to Destiny's first birthday. (Exhibit 5; Testimony of Tamara B., Roberto R.) The court received no credible evidence reflecting any visitation or communication between Roberto R. and Destiny following the commencement of the respondent father's incarceration in late 1995, until early 1999 when the child was four years old.
When the court issued the OTC for Destiny on October 25, 1998, Roberto R. was still incarcerated in Connecticut. (Testimony of Roberto R., Tamara B.) As noted, the court (Holden, J.) imposed specific steps for Roberto R. on October 30, 1998. (Exhibit 11.) The steps required, inter alia, that he have no further involvement with the criminal justice system and visit with Destiny as often as DCF permits. During the course of his Connecticut incarceration, Roberto R. took a three-month parenting course of unspecified content, and he executed releases permitting DCF to obtain information concerning his status and history. From February through July 1999, in response to Roberto R.'s request, DCF brought four-year old Destiny to monthly visits with him at the correction facility where he was located. Roberto R. also wrote several letters and prepared drawings for Destiny during this period, which DCF provided to her in a timely fashion. (Exhibits 5, 6; Testimony of Tamara B.)
On August 25, 1999, Roberto R. was transferred from Connecticut and extradited to Puerto Rico, where he faced charges arising from a robbery he had committed in 1991.[10] (Exhibits 5, 6; Testimony of Roberto R.) CT Page 11755 He is currently serving a seven year sentence in Puerto Rico. (Exhibits 5, 6.)
While subject to his sentence in Puerto Rico, Roberto R. has written to DCF on only two occasions, requesting information about the status of his daughter in the fall of 1999. He has neither written to the agency since that time nor has he requested additional contact with the child, except through the TPR litigation. Furthermore, Roberto R. has not provided DCF with adequate addresses at which he could be reached, and did not advise the agency when he was moved from facility to facility. Accordingly, DCF was largely unsuccessful in its reasonable efforts to maintain contact with Roberto R., although the agency was finally able to secure a telephone connection with him during the winter of 2001. (Testimony of Julie M., Tamara B., Roberto R.)
While denying that he has any substance abuse problems, Roberto R. secured a transfer from his jailed status into an in-patient program for substance abusers in Puerto Rico sponsored by Hogar Nuevo Pacto. Commencing in January 2000, he spent approximately sixteen months receiving support and instruction in a structured residential setting. (Exhibits AA, BB.) In May of 2001, Roberto R. completed this program, and was transferred to a half-way house, still under the supervision of corrections officials in Puerto Rico. (Exhibit BB; Testimony of Roberto R.)
Roberto R. admits that he last wrote to Destiny in early 2000. He has not communicated with the child since that time in any way, and has sent her no gifts, cards, letters or mementos. He last visited with his daughter in July 1999, just prior to his extradition to Puerto Rico. Roberto R. has never provided physical care or financial support for Destiny. (Exhibits 2, 5, 6.) He has neither knowledge of this child's special emotional and behavioral needs, nor any means or method for appropriately addressing her significant mental health and developmental issues. (Testimony of Roberto R.)
Roberto R. has suggested that while he remains incarcerated, Destiny should be cared for by his mother, who has lived in Florida and Connecticut. See Part II. A. Other than this placement reference, Roberto R. has established no further plans for the child or her future.
I. D. THE CHILDREN
Juan, Carlos, Grace and Destiny have resided in the foster home maintained by Maria and Placido R., since their removal from Ana A.'s care in October 1998. Natalie has resided in a separate foster home, with Madeline and Norberto Z., for over two-and-a-half years. In October CT Page 11756 2000, in addition to performing an interactional evaluation involving Ana A., Dr. Freedman observed the children interacting with their foster mothers. It is apparent that the children all look to their foster parents as their primary and psychological parents.[11] (Testimony of Dr. Freedman.)
The eldest sibling, Juan, was born on June 1989: he is twelve years old. With Carlos, Grace and Destiny, he has comfortably resided in the stable foster home maintained by Maria and Placido R. for nearly three years. (Exhibit 5; Testimony of Tamara B.) Juan repeated first grade, receives special education services, and attends middle school. Although he manifested severe behavior problems when first placed in foster care, Juan has now settled down and become more cooperative. He continues to receive counseling from Child Guidance to address his aggressive and argumentative behaviors. As the result of therapy and the structure and support he receives in his foster home, Juan has been relieved of the self-imposed obligation to serve as a surrogate parent, and no longer displays inappropriately parentified behaviors that had developed when the children resided with Ana A. (Exhibits 5, 15; Testimony of Dr. Freedman.) As the oldest of the siblings, Juan maintains a natural loyalty to Ana A., but he has developed a firm bond with his foster mother, as well.
Carlos, who was born on December 1990, calls his foster parents "mom" and "dad." (Exhibits 5, 15.) Carlos is ten-and-a-half years old: he repeated the first grade, receives special education services, and is now in middle school. Like Juan, Carlos exhibited disruptive, negative behaviors when he first entered foster care, but he has received great benefit from the counseling he attends at Child Guidance to address his introversion, aggression, and domineering behavior. Carlos is no longer overwhelmed by the anger he felt toward Ana A. when first placed in foster care, and he is now well-adjusted in his foster home. (Exhibit 5; Testimony of Dr. Freedman.)
Natalie was born on January 1992. Although she repeated kindergarten, at age nine she is quite well-adjusted and comfortable in her foster home living with Madeline and Norberto Z., apart from her siblings. Although she has some basic attachment to Ana A., Natalie has clearly expressed her desire to become adopted by her foster parents, to whom she is devoted and firmly bonded. (Testimony of Dr. Freedman.) Natalie had received counseling from Child Guidance, but the agency found her to no longer need services. (Exhibits 5, 15.)
Grace, who is seven-and-a-half, was born on November 1993 She is quite content in her foster home, and receives counseling from Child Guidance. Grace repeated her kindergarten year. Like her brothers, Grace maintains CT Page 11757 a close, secure relationship with her foster mother, although she also remains interested in her biological mother. (Exhibits 5, 15; Testimony of Dr. Freedman.)
Destiny, who was born on January 1995, is five-and-a-half years old. Her behavior is at times hyperactive, angry, defiant and prematurely sexualized in nature. She exhibits signs of developmental delay, for which she has participated in play therapy at Family Services, and now receives counseling at Child Guidance. Destiny has shown some improvement in her behavioral difficulties and developmental delays: she will long require the attention of parents who are able to exhibit much patience, skill and a conscientious commitment to positive nonphysical discipline to offer this child a realistic opportunity for healthy growth and development. (Exhibits 5, 15; Testimony of Dr. Freedman, Tamara B.)
II. ADJUDICATION
As to the adjudicatory phase of these proceedings,[12] the court has considered the evidence and testimony related to circumstances and events prior to May 10, 2001, the date upon which the TPR petitions were amended. In considering the allegation of failure to rehabilitate that has been brought against Roberto R., the court has also reviewed the evidence and testimony related to circumstances through the close of trial.[13] Upon review, the court has determined that statutory grounds for termination exist as to both Juan O. and Roberto R., and relies upon the valid consent to TPR that was tendered by Ana A.
II. A. LOCATION AND REUNIFICATION EFFORTS
The court finds that the petitioner has met her burden of proving, by clear and convincing evidence, that reasonable efforts[14] were made to locate and reunify Juan O. and Roberto R. with their children, as is required by General Statutes § 17a-112 (j)(l).[15]
As previously discussed, on March 22, 2000, after hearing, the court (Lopez, J.) found that further efforts at reunification would not be appropriate for Juan O. or Roberto R. Furthermore, as noted above, Juan O., did not make himself available for participation in these proceedings despite the due notice referenced above. Also, as Roberto R. has been incarcerated since 1995, DCF was rendered unable to assign service providers during this period. Based on the clear and convincing evidence produced at trial, the court now finds that, under the circumstances of this case, both respondent fathers are either unable or unwilling to benefit from reasonable reunification efforts. § 17a-112 (j)(1).
Insofar as reunification is concerned, the court notes that Roberto R. CT Page 11758 offered his mother. Luisa G., as a placement resource for Destiny. (Exhibit 5; Testimony of Tamara B., Julie M.) DCF conducted an interstate compact study while Luisa G. lived in Florida: although she has now apparently moved to Connecticut, she has not been disqualified for placement purposes. (Testimony of Tamara B., Julie M.) However, Destiny has never met Luisa G., has only spoken to her on the telephone, and has no attachment to her or to any other paternal relatives. (Testimony of Tamara B.) Although Luisa G. has recently offered to serve as a placement for Destiny's other siblings, as well, the court finds that it would be unduly disruptive to have Destiny leave her current foster home, and move to Florida to reside with her. As discussed in Part III. B., the other siblings would be similarly inappropriately disrupted by such a change. (Testimony of Dr. Freedman, Julie M.) Accordingly, the court is unable to recommend this placement.
II. B. STATUTORY GROUNDS FOR TERMINATION
II. B. 1. JUAN O.
II. B. 1. a. ABANDONMENT — § 17a-112 (j)(3)(A)
As its first ground against Juan O., the petitioner alleges that this respondent has abandoned Juan, Carlos, Natalie and Grace within the meaning of § 17a-112 (j)(3)(A).[16] In the absence of evidence to the contrary, and applying the requisite legal standards,[17] the court finds this matter in favor of the petitioner.
The uncontroverted evidence in this case credibly reveals that Juan O. has failed to maintain any detectable interest, concern, or responsibility as to the welfare of Juan, Carlos, Natalie or Grace. He has neither attempted nor succeeded in contacting the children through written or oral means of communication; has not sent them cards, gifts or mementos, and has not furnished any financial support. He has never provided expressions of love and affection; expressed concern over their health, education or well-being; provided them with appropriate food or shelter; or extended social or religious guidance. In re Deana E.,
supra, 61 Conn. App. 193; In re Kezia M, supra, 33 Conn. App. 17-18. Juan O. has apparently taken up residence in a nearby state, yet has failed, on multiple occasions, to respond to due notice, and has not made himself available to DCF or for any court proceedings involving the interests of his progeny. (Exhibit 5.)
Focusing upon this parent's conduct, whether the adjudicatory date of March 29, 2000 or May 10, 2001, or the evidentiary closure date of June 20, 2001 is applied, the evidence in this matter clearly and convincingly establishes that Juan O. has failed to meet "[t]he commonly understood CT Page 11759 obligations of parenthood" identified In re Deana E., supra,61 Conn. App. 193. Accordingly, based on clear and convincing evidence, the court finds that the petitioner has met her burden of proving that Juan O. abandoned Juan, Carlos, Natalie and Grace, within the meaning of § 17a-112 (j)(3)(A).
II. B. 1. b. LACK OF ONGOING PARENT-CHILDREN RELATIONSHIP —§ 17a-112 (j)(3)(D)
The petitioner next alleges that because there is no ongoing parent-child relationship between Juan O. and his children, this respondent's parental rights should be terminated pursuant to General Statutes § 17a-112 (j)(3)(D).[18] In the absence of evidence to the contrary, and applying the requisite legal standards,[19] the court finds this matter in favor of the petitioner.
The clear, convincing, and uncontroverted evidence in this case establishes that no parent-child relationship has existed between Juan O. and his progeny since October 1998, as subsequent to that date other persons have continuously "met on a day to day basis the physical, emotional, moral and educational needs of the [children]." § 17a-112
(j)(3)(D). (Exhibit 5.) Furthermore, the evidence clearly and convincingly supports the logical inference that whether the adjudicatory date of March 29, 2000 or May 10, 2001 or the trial completion date of June 20, 2001 is utilized, there is a reasonable basis for concluding that no such relationship had existed since 1996, when Juan O. last had contact with Ana A. and her children. (Exhibits 2, 3, 5, 6.)
Having determined that no parent-children relationship exists, the court must next assess whether, in the future, it would be detrimental to the children to allow time for them to develop such a relationship with Juan O. In re Jonathon G., supra, 63 Conn. App. 525. Under the circumstances of this case, extending time for such a purpose would clearly be adverse to the children's best interests. Juan, Carlos, Natalie and Grace maintain little or no memories of Juan O. as their father. All have required care and attention to their special psychological needs, are firmly bonded to their foster parents, and have adjusted well to their lives without Juan O. (Exhibit 15; Testimony of Dr. Freedman.) Given Juan O.'s long absence, his inattention to these proceedings, and the dearth of present information concerning this biological parent or his lifestyle, the court must logically conclude that any efforts at reunification with this father would impose an unreasonable element of stress and uncertainty upon the children's well-being, without a known, beneficial outcome. Furthermore, any establishment or re-establishment of a parenting relationship between Juan O. and Juan, Carlos and Grace would likely necessitate their CT Page 11760 separation from their half-sister, Destiny. The psychological evidence reflects that it would be very traumatic for them to be separated from Destiny, with whom they have resided since her birth. It must also be noted that Natalie is extremely happy in her present home, and insists upon adoption by her foster parents: any establishment or re-establishment of a parenting relationship between Juan O. and this child would subject her to unwarranted intrusion and instability. Thus examining the totality of the evidence, it is clear that it would be detrimental to the best interests of Juan, Carlos, Natalie and Grace to allow time to develop a parent-child relationship with Juan O.
"It is reasonable to read the language of no ongoing parent-child relationship to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitively lost that relationship, so that despite its former existence it has now been completely displaced." (Citations omitted.) In re John G.,56 Conn. App. 12, 22, 740 A.2d 496 (1999). In the present case, the clear and convincing evidence establishes that any valid relationship that Juan O. may have developed with his children has been definitively lost due to his own absence and inattention. As the clear and convincing evidence in this case establishes that no ongoing parent-children relationship exists between Juan O. and his offspring, and that it is not in the best interests of Juan, Carlos, Grace or Natalie to allow more time for them to develop a relationship with their biological father, the petitioner has met her burden of proof under § 17a-112 (j)(3)(D). In reJonathon G., supra, 63 Conn. App. 525; In re John G., supra,56 Conn. App. 22.
II. B. 2. ROBERTO R.
II. B. 2. a. PARENTAL FAILURE TO REHABILITATE — § 17a-112 (j)(3)(B)(i)
The petitioner first alleges that the statutory ground of parental failure to rehabilitate supports the application for termination of Roberto R.'s parental rights to Destiny pursuant to § 17a-112 (j)(3) (B).[20] Roberto R. counters that he has attended to the pivotal elements of his specific steps, and that he has made sufficient progress in rehabilitation to resume a responsible role in his daughter's life. There is no question that the court adjudicated Destiny a neglected child on June 30, 1999. The critical issue facing the court thus centers upon whether Roberto R. was better able to be a parent to Destiny as of the close of the evidentiary portion of this trial on June 20, 2001, than he was at the time of her neglect adjudication almost two years earlier. SeeIn re Sarah Ann K., 57 Conn. App. 441 448 ___ A.2d ___ (2000). Applying CT Page 11761 the requisite legal standards,[21] the court finds this allegation in favor of the petitioner.
The clear and convincing evidence establishes that Roberto R. has been incarcerated for almost six years, nearly all of Destiny's lifetime, and that he has yet to complete serving his present sentence. Roberto R.'s history of drug-related and violent criminal activity, and his nonconformity with those social norms which are consistent with appropriate parenting, have directly led to his lengthy periods of incarceration in Connecticut and in Puerto Rico. During his confinement, there may have been some improvement in Roberto R.'s ability to manage his own affairs, but the evidence reflects no enhancement of his capacity to serve as an effective caregiver for Destiny. Roberto R. left the home in which Destiny resided when she was a newborn, supporting the inference[22] that he failed even to care for his daughter during this formative period: he has never improved his parenting skills related to the physical care and support of a child, and has consistently left those matters to others. Although Roberto R. attended a three-month parenting class in 1999, the court received no credible evidence concerning the content or quality of this program. Thus, it would be unreasonable to assume that through such a class, Roberto R. gained a practical ability to put into place whatever parenting skills he may have learned. (See Exhibits 3, CC.) Furthermore, notwithstanding the laudable focus of the Hogar Nuevo Pacto program upon issues related to spirituality and management of alcohol and other substance abuse, it would be unreasonable to conclude that Roberto R.'s participation in that alternative-to-incarceration regimen rendered him either rehabilitated and able to serve as an appropriate parent for Destiny, or knowledgeable and committed to meeting this child's special needs. The reports submitted by the agency fail to provide a reasonable basis for inferring, for instance, that by attending Hogar Nuevo Pacto and following its regimen Roberto R. learned effective and acceptable methods of dealing with Destiny's manifest behavioral issues. The more reasonable inference is that, given his long period of incarceration and separation from his daughter, and given his focus upon serving his sentence and addressing his substance abuse issues, Roberto R. has not achieved rehabilitation related to Destiny's particular needs: he has not gained the ability to positively and consistently manage a child such as Destiny, who presents with issues related to hyperactivity, defiance, anger, or inappropriate sexual conduct; and he clearly has not developed the knowledge, patience, or skills necessary to parent this special little girl. (See Testimony of Dr. Freedman.)
Roberto R. vigorously argues that because he has not failed to comply with the specific steps imposed by the court in October of 1998, he cannot be found to have failed to achieve rehabilitation. There are CT Page 11762 several determinative flaws in this argument. First, Roberto R. posits that the steps establish the sole grounds for reaching rehabilitation. Such an assumption would bypass, however, the precept holding that while steps may serve as one method of measuring progress toward rehabilitation, they are not dispositive, as a respondent bears an independent responsibility to improve his ability to serve as an effective parent. In re Michael M., 29 Conn. App. 112, 125, 614 A.2d 832
(1992). Second, this assumption disregards the petitioner allegation that he has failed to become rehabilitated within the meaning of § 17-112 (j)(3)(B)(i) [formerly § 17-112 (c)(3)(B)(1)], wherein specific steps are not a requisite to the court's finding grounds for termination. See In re Michael M., supra, 29 Conn. App. 125 (our courts do no require an articulation of expectations or strict compliance thereto as a condition precedent to finding of failure to rehabilitate). Third, this argument asks that the focus be shifted away from the conduct of the parent involved, and onto orders the court has imposed. Such a focus unreasonably diffuses the obvious fact that it is Roberto R.'s own criminal acts which have led him to face extended incarceration, enforced separation from his child, and an inability to servi as a responsible parent, all indicating his failure to achieve rehabilitation as contemplated b: § 17-112 (j)(3)(B).
The court's application of this statutory provision requires an analysis of the time when it is foreseeable that a respondent may achieve the ability to serve as an effective caretaker for his child. The clear and convincing evidence in this case supports the conclusion that Roberto R. will not achieve this status in the reasonably foreseeable future. Roberto R. is currently serving seven year sentence for robbery, a crime of violence. The consistent evidence establishes August 1999 as the earliest date on which he could have started serving this sentence, following his extradition to Puerto Rico.[23] Although Roberto R. minimizes his responsibility for the robber at issue, Puerto Rico sought to extradite him from Connecticut in 1999, some eight years after the crime had taken place. From this significant interest in the criminal act, and in the light of Roberto R.'s prior felony convictions in Connecticut and his prolonged fugitive status, the court reasonably infers that the commonwealth intends to have Roberto R. serve a significant portion of his seven year sentence, without discharge from its supervision. (Exhibits 3, 5, 6.) Such circumstances will not permit Roberto R. to serve as an appropriate parent for Destiny in the foreseeable future. Destiny cannot be expected to wait any longer for Roberto R. to satisfy his obligations to the criminal justice system, or to develop the parenting skills she so desperately deserves.
Roberto R., who left Destiny in her first year of life, has never been a father to this child and he does not, even now, intend to fulfill that CT Page 11763 role: rather, he would have his mother serve a Destiny's "parent" while he completes serving his sentence and works toward rehabilitation (Testimony of Roberto R.) Such a tortuous series of placement would only exacerbate Destiny's behavioral problems by moving her from the stable, secure environment where she has lived for two and a half years, into the unknown entity that is her paternal grandmother's home in Connecticut and, ostensibly, back into Roberto R.'s care once he is released by the prison authorities in Puerto Rico. Roberto R.'s suggestion of such events, while ingenious, illustrate the fact that he remains overly concerned with his own needs, and is still unable to focus on th needs of his emotionally fragile but demanding special needs child.
In his adult life, Roberto R. has consistently made choices that are inconsistent with service as a responsible parent. As noted in Part I. C., he elected to flee from Puerto Rico in 1991 after committing a crime of violence, preferring to remain a fugitive instead of facing his accusers and accepting the legal consequences of his illegal acts. He left Destiny soon after her birth, and has failed to provide for her physical, emotional or financial needs thereafter. When he was extradited to Puerto Rico, he failed to maintain any contact with either Destiny or DCF, and let his relationship with this child lapse even while he was allowed to participate in the Hogar Crea program. In short, Roberto R. has never made Destiny his first priority, and there is nothing in the credible evidence produced at trial that would support the inference that he will be able to assume a responsible position in this child's life within a reasonable time. Accordingly, the court finds, by clear and convincing evidence, that the petitioner has proved Roberto R.'s failure to achieve rehabilitation pursuant to § 17a-112 (j)(3)(B).
II. B. 2. b. LACK OF ONGOING PARENT-CHILD RELATIONSHIP — § 17a-112(j)(3)(D)
The petitioner further claims that because no ongoing parent-child relationship exists between Roberto R. and Destiny, this respondent's parental rights should be terminated pursuant to General Statutes §17a-112 (j)(3)(D).[24] Roberto R. counters that he had visited with this child when he was physically able to, so that the elements of §17a-112 (j)(3)(D) cannot be met. Applying the requisite legal standards and two-pronged analysis as described in Part II. B. 1. b, the court finds this issue in favor of the petitioner.
The clear, convincing, and uncontroverted evidence in this case establishes that there is no extant parent-child relationship between Destiny and Roberto R. as, since from the time of her her birth, and certainly since his incarceration, others have met on a day to day basis the physical, emotional, moral and educational needs of the child. § CT Page 1176417a-112 (j)(3)(D). Although there was a brief period of intermittent contact from February through July 1999, during the overwhelming remainder of the period Roberto R. "was physically, emotionally and spiritually unavailable to the child as a parent figure." In re SavannaM., supra, 55 Conn. App. 815. While she enjoyed her visits with him, during the first half of 1999, Destiny has neither mentioned nor inquired about Roberto R. since the time of his incarceration in August of that year. (Tamara B.) Thus, even if Destiny may maintain some notions or memories of these visits and of Roberto R., these feelings do not arise from any realistically based parental love or affection, but from her recollections of a pleasant playmate.
Dr. Freedman specifically considered the potential results of allowing additional time for a relationship to develop between Roberto R. and Destiny, and credibly opined that such action would not be in the child's best interests.[25] As noted in Part I.D., as she begins her school years, Destiny is already showing signs of behavioral and emotional difficulties. She has spent but a brief period of time with Roberto R., consisting of visits which took place in the first half of 1999. She maintains some memories of enjoyable play times with him, but has no concept of Roberto R. in the position of a parental figure, or as a primary caretaker. If Destiny were required to wait before a decision regarding permanency was made, or if she was made to participate in a transitioning process where the predictable parenting techniques used by her foster mother were subject to question, her mental health would be adversely affected, and her growth and development would become even more delayed. (Testimony of Dr. Freedman.) As Dr. Freedman explained, Destiny would be psychologically devastated if she were removed from her current placement, which is, in fact, the only home she has ever really known, and where she has securely resided with three of her siblings. Under these circumstances, the court is constrained to conclude that it is not in Destiny's best interests to allow more time for her to develop a relationship with her biological father.
Roberto R. admits that he has never supported Destiny financially. (Testimony of Roberto R.) As discussed in Part II. B. 1. b., any establishment or re-establishment of a parenting relationship between Roberto R. and Destiny would involve some intrusion into the stable life she has fostered with Juan, Carlos and Grace, and might even result in Destiny's severance from her siblings. Given this child's past and present demonstration of emotional and behavioral difficulties, this child's acknowledged need for permanency, and Roberto R.'s history of irresponsibility and criminal activity, the court must realistically infer that any efforts a reunification with Roberto R. would add an unreasonable element of stress and uncertainty into Destiny's life, without a known, beneficial outcome. CT Page 11765
Whether the adjudicatory date of March 29, 2000 or May 10, 2001 or the evidentiary closure date of June 20, 2001 is applied, the clear and convincing evidence in this case establishes that no ongoing parent-child relationship exists between Roberto R. and Destiny. As the clear and convincing evidence further discloses that it is not in Destiny's best interests to allow more time for her to develop a relationship with her biological father, the petitioner has met her burden of proof under § 17a-112 (j)(3)(D). In re Jonathon G., supra, 63 Conn. App. 525.
III. DISPOSITION
As to the dispositional phase of this hearing,[26] the court has considered the evidence and testimony related to circumstances and events up to and including June 20, 2001, the date upon which the evidence in this matter was concluded.[27]
III. A. SEVEN STATUTORY FINDINGS
The court has made each of the following seven written factual findings required by General Statutes § 17a-112 (k) based upon the clear and convincing evidence produced at trial, and has considered the evidence and information relevant to each of these findings in the course of determining whether to terminate parental rights under this section.[28]
The court notes that such findings are only required as to Juan O. and Roberto R., in light of Ana A.'s consent to TPR.
III. A. 1. TIMELINESS, NATURE AND EXTENT OF SERVICES — § 17a-112(k)(1)
The court finds that services were inappropriate and unnecessary for Juan O. under the circumstances of this case, given the fact that he has not been available to the petitioner and he has not participated in the proceedings which led to the adjudication of neglect regarding his children. See Part II. A., above, referencing the court's previous finding that such efforts are not appropriate as to Juan O. and Roberto R.
As to Roberto R., the court further finds that he has been incarcerated for almost all of his daughter's life. While he was incarcerated in the state of Connecticut, DCF actively facilitated monthly visitation with Destiny from February through July 1999. However, when Roberto R. was extradited on August 26, 1999 and removed to a corrections facility in Puerto Rico, DCF was no longer reasonably able to arrange for visitation with this young child. Although Roberto R. has participated in some rehabilitation programs sponsored through his current corrections CT Page 11766 supervisors, due to his location and incarceration, DCF was unable to provide him with personal services directed at reunification. At the request of Roberto R., DCF obtained an interstate compact study regarding his mother, a potential placement for Destiny and her siblings. However, as discussed in Parts II. A. and III. B., the court has determined that it would be adverse to the children's best interests if Destiny or the others were removed from their current placements.
III. A. 2. REASONABLE EFFORTS AT REUNIFICATION PURSUANT TO FEDERAL LAW — § 17a-112 (k)(2)
The court finds that although DCF made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended, neither Juan O. nor Roberto R. is able or willing to benefit from reunification. See also Part II. A., above, referencing the court's previous finding that such efforts are not appropriate.
III. A. 3. COMPLIANCE WITH COURT ORDERS — § 17a-112 (k)(3)
As noted, the court ordered specific steps for Roberto R. on October 30, 1998 Roberto R. may have partially complied with the steps through participation in the Hogar Crea program and attendance at parenting classes sponsored by correctional facilities. However, h failed to avoid involvement with the criminal justice system, and became subject to extradition to Puerto Rico while the steps were in effect. No orders as to Juan O. are at issue in this case as he has had no contact with DCF regarding his children, and has not appeared or participate in any court-related proceedings.
III. A. 4. THE CHILDREN'S FEELINGS AND EMOTIONAL TIES — § 17a-112(k)(4)
The court finds that Juan, Carlos, Grace, Destiny and Natalie have strong emotional ties and attachments to Maria and Placido R. and to Madeline and Norberto Z., their respective foster parents, who have throughout provided them with appropriate physical, emotional and educational support and moral guidance. Destiny R., who presents with the most troubling behavioral issues is strongly attached to her foster family and to her siblings.
With regard to the children's ties to their biological parents, the court further finds a follows: Juan, Carlos, Grace and Natalie have little or no emotional ties to Juan O., and Destiny has no viable memory of or attachment to Roberto R., although she had visited with him during his incarceration in Connecticut. (Exhibit 15; Testimony of Dr. CT Page 11767 Freedman.)
III.A. 5. AGES OF THE CHILDREN — § 17a-112 (k)(5)
Juan is 12; Carlos is 10; Natalie is 9; Grace is 7; and Destiny is 6.
III. A. 6. PARENTS' EFFORTS TO ADJUST THEIR CIRCUMSTANCES — § 17a-112(j)(6)
Neither Juan O. nor Roberto R. has maintained adequate contact with the children, with the foster parents, or with DCF regarding the status of the children involved. In view of Juan O.'s lack of communication with his offspring, and Roberto R.'s continuous incarceration, it is apparent that these fathers have not made realistic and sustained efforts to conform their conduct to even minimally acceptable parental standards. Giving them additional time would not likely bring their performance, as parents, within acceptable standards sufficient to make it in the best interests of the children to be reunited with either of them.
III. A.7. EXTENT TO WHICH PARENTS WERE PREVENTED FROM MAINTAININGRELATIONSHIPS WITH THE CHILDREN — § 17a-112 (j)(7)
The court finds that no unreasonable conduct by the child protection agency, foster parents or third parties prevented either of the respondent fathers from maintaining relationships with their children. It is clear that Juan O. showed no interest in his children during relevant periods, and his own inattention caused the absence of a relationship with them. It is also clear that Roberto R. has actually demonstrated only a limited degree of interest in maintaining contact with Destiny. Although Roberto R. attended visitation while incarcerated in Connecticut, since he was extradited to Puerto Rico, he has showed minimal interest in Destiny, at best. He may have sent the child letters and drawings prior to this extradition, but the process stopped thereafter, without adequate explanation. The court does note that several months may have transpired between Roberto R.'s first request for visitation with Destiny, and February 1999, when DCF facilitated the commencement of visitation. Given Roberto R.'s long-term confinement and Destiny's young age at the time, however, this brief delay cannot constitute a measurable or unreasonable degree of interference with the maintenance of their parent-child relationship. More importantly, Roberto R.'s protracted period of incarceration, resulting from his own criminal activities, along with his consistent and unreasonable failure to communicate with Destiny, has prevented Roberto R. from establishing or maintaining a relationship with this child. Thus, his own acts, and not the acts of others have caused him to be displaced as a possible parental figure for this child. CT Page 11768
III. B. BEST INTERESTS OF THE CHILDREN — § 17a-112 (c)(2)
The court is next called upon to determine whether termination of the parental rights of Ana A. would be in the best interests of all the children, whether the termination of Juan O.'s parental rights would be in the best interests of Juan, Carlos, Natalie and Grace, and whether termination of Roberto R.'s parental rights would be in Destiny's best interests.[29] Applying the appropriate legal standards[30] to the facts which are clearly and convincingly apparent in this case the court finds that termination of these parental interests will best serve the children at issue here.
In determining whether termination of the respondents' parental rights would be in the best interests of Juan, Carlos, Grace, Natalie and Destiny, the court has examined the multiple relevant factors. In addition to issues related to the children's interests in sustained health stability and continuity of their environment, these factors include the length of their stay in foster care; the nature of their relationship with their foster parents; the nature of their relationship with their biological parents, and the degree of contact maintained with them. In re Savanna M., supra, 55 Conn. App. 816. "In addition, the genetic bond shared by a biological parent and his or her child, although not determinative of the issue of the best interest of the child, is certainly a factor to consider." (Citations and quotation marks omitted.) Id. In a matter such as this, the court is further called upon to balance the children's intrinsic needs for stability and permanency against the maintenance of any connection with their biological parents. Pamela B.v. Ment, 244 Conn. 296, 314, 709 A.2d 1089 (1998).
Applying this analysis to the circumstances presented in this matter, the clear an convincing evidence in this matter establishes that it is not in the children's best interests to continue to maintain any legal relationship with their biological parents. It is lamentably evident that Ana A.'s persistent substance abuse, inability to maintain a lifestyle free from ready access to drugs, criminal activities, and selection of inappropriate male partners have, as a practice matter, rendered her chronically unable to properly attend to the children's need for good health stability and continuity in their living environment. As noted by the evaluating psychologist in this case, Ana A.'s poor judgment, lack of insight, and continued failure to complete substance abuse treatment all establish that she cannot serve as a reliable caretaking parent for these children now, or in the foreseeable future.[31] (Testimony of Dr. Freedman.) However, her tender of consent to the TPR petition represents a selfless and mature act which both demonstrates her love for her offspring and frees them from their biological bonds, so that they can be placed in permanent, safe and secure homes within which to enjoy the CT Page 11769 remaining years of their childhood. As to the children's fathers, it is abundantly clear that Juan O. has neither the ability nor the interest to provide an adequate home, for Juan, Carlos, Natalie or Grace.[32]
Similarly, despite his optimistic but inflated notions of his own capabilities, Roberto R. is also unable able to supply these critical elements for Destiny's life, as he remains subject to the corrections authorities in Puerto Rico, and has not achieved the parenting skills necessary for dealing with his daughter's special emotional and behavioral issues.[33] In re Savanna M., supra. 55 Conn. App. 816. While the children maintain a comfortable relationship with their biological mother, Juan, Carlos, Natalie and Grace have had no contact, and maintain no relationship at all with Juan O., and Destiny's connection to Roberto R. is so slight and remote in time as to be insignificant in nature. Id. On the other hand, these children have all been in foster care for a prolonged period of time, and they have developed stable, loving and predictable relationships with their foster parents. Id. Balancing the children's intrinsic needs for stability, sustained growth, development and well-being against the ephemeral benefits of maintaining a legal connection with their biological parents, the evidence overwhelmingly militates in favor of allowing the parental rights to be terminated so the children can be made available for adoption, and permitted the opportunity to become permanent, secure members of the foster families with whom they now reside. Pamela B. v.Ment, supra, 244 Conn. 314; In re Alexander C., supra, 60 Conn. App. 559.
Other clear and convincing evidence supports the court's conclusion that termination of the parental rights of Ana A., Juan O. and Roberto R. will serve the best interest of the children at issue in this matter. These children are all of sufficient age and capacity to express an intelligent preference as to placement: while they retain a valid non-parenting fondness for their biological mother, they overall uniformly seek permanent residence with their foster parents, and not with their biological parents. (Exhibits 8, 15; Testimony of Dr. Freedman.) Their emotional status is enriched through the sibling visits in which they all engage at the instance of their foster families, nurturing the continuing relationship between Juan, Carlos, Grace and Destiny with Natalie, who resides in a separate home. (Exhibits 8, 15.)
Furthermore, as Dr. Freedman indicated, these children have already spent more than enough time in placement, awaiting the outcome of the termination proceedings.[34] For their benefit, the issues of permanency should be resolved now, without any change in their placement, which would be detrimental to their best interests. All five children are receiving appropriate support and guidance in their foster homes, but they would suffer emotional setbacks in the event of any move from that residential setting. (Testimony of Dr. Freedman.) Natalie's foster CT Page 11770 parents have expressed a willingness to adopt her if she becomes available to them, and Maria and Placido R., the foster parents for Juan, Carlos, Natalie and Destiny, have expressed a similar desire. (Exhibit 5.) Under all these circumstances, it is clear that, at the least, the children should be allowed to remain in the safety and security of their current foster environments, where they have adjusted and where their positive growth and development is favorably supported. (Exhibit 15, Testimony of Dr. Freedman.)
The evaluating psychologist and the children's GAL concur in the conclusion that termination of Ana A.'s, Juan O.'s and Roberto R.'s parental rights would be in the best interests of all the children at issue in this case.[35] Their foster homes are extremely important to these children and provide, in the opinion of their GAL, "excellent" opportunities for each of the siblings to grow and mature. Our courts have recognized that "long-term stability is critical to a child's future health and development." In re Eden F., supra, 250 Conn. 709. Furthermore, "[b]ecause of the psychological effects of prolonged termination proceedings on young children. time is of the essence . . ." when resolving issues related to the permanent or temporary care of neglected children. In re Alexander V., 25 Conn. App. 741, 748,596 A.2d 930 (1992); see also In re Juvenile Appeal (84-CD), 189 Conn. 276,292, 455 A.2d 1313 (1983). The court is constrained to agree with Dr. Freedman and the GAL and concludes that the clear and convincing evidence in this case establishes that the children at issue are entitled to the benefit of ending, without further delay, their long period of uncertainty as to the availability of their biological parents as caretakers.
Accordingly, with respect to the best interests of the children contemplated by § 17a-112 (j)(2), by clear and convincing evidence, and based upon all of the foregoing, the court finds that termination of the parental rights of Ana A. and Roberto R. is in the best interest of the child Destiny R., and the court further finds that the termination of the parental rights of Ana A. and Juan O. is in the best interests of the children Juan A., Carlos O., Natalie A. and Grace O.
IV. ORDER OF TERMINATION
WHEREFORE, after due consideration of the children's sense of time, their need for secure and permanent environment, the relationship they have with their foster parents, and the totality of circumstances; and having considered all the statutory criteria and having found b clear and convincing evidence that grounds exist for termination of parental rights; and having concluded that the termination of the parental rights at issue will be in the children's best interest, the court issues the CT Page 11771 following ORDERS:
That the parental rights of Ana A. and Juan O. are hereby terminated as to Juan A., Carlos O., Natalie A. and Grace O.
That the parental rights of Ana A. and Roberto R. are hereby terminated as to Destiny R.
That the Commissioner of the Department of Children and Families is hereby appointed the statutory parent for Juan A., Carlos O., Grace O., Natalie A., and Destiny R. for the purpose of securing an adoptive family or other permanent placement for these children.
That the petitioner shall submit a permanency plan within 30 days of this judgment. That primary consideration for adoption of Juan, Carlos, Grace and Destiny shall be offered to their current foster parents, and that primary consideration for adoption of Natalie shall be given to her current foster parents.
BY THE COURT,
N. Rubinow, J.